
Case 4:21-cv-00453-BLW   Document 1   Filed 11/19/21   Page 1 of 13


DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Rd., Suite B
Idaho Falls, ID 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
IN THE DISTRICT OF IDAHO

| | |
|---|---|
| MATHEW KINLAW<br><br>PLAINTIFF,<br><br>v.<br><br>BATTELLE ENERGY ALLIANCE, LLC<br><br>DEFENDANT. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $ 402.00 |

COMES NOW, Plaintiff Mathew Kinlaw, by and through counsel of record Casperson Ulrich Dustin PLLC and for cause of action against Defendant Battelle Energy Alliance, LLC alleges and complains as follows:

**JURISDICTION AND VENUE**

1. This is an action brought under the Americans with Disabilities Act, as amended, ("ADA") 42 U.S.C. § 12101, *et seq.*; the Idaho Human Rights Act ("IHRA"), Idaho Code § 67-5901, *et seq*; and the common law of the State of Idaho.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

3. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial

1- COMPLAINT AND DEMAND FOR JURY TRIAL

district.

## PARTIES

4. Plaintiff Mathew Kinlaw ("Plaintiff") is a male citizen of the United States of America, who resides in Idaho Falls, Idaho.

5. Defendant Battelle Energy Alliance, LLC ("Defendant" or "BEA") is a Delaware limited liability company, with its principal place of business in Idaho Falls, Idaho.

6. At all times material to this Complaint, Defendant regularly employed fifteen or more persons, and was engaged in an industry affecting commerce, bringing Defendant within the ambit of 42 U.S.C. §12101, *et seq.* and Idaho Code § 67-5901, *et. seq*.

## FACTS COMMON TO ALL COUNTS

7. Plaintiff incorporates paragraph 1 through 6 as though fully set forth herein.

8. Plaintiff is disabled within the meaning of the ADAAA and the IHRA.

9. On January 21, 2008, Plaintiff began working for BEA at the Idaho National Laboratory as a nuclear physicist.

10. Plaintiff's disabilities result in a flat affect, stimming, and a desire not to be hugged or touched, among other manifestations. His disabilities also affect his ability to interact with others. All of these characteristics were known to BEA management, human resources and coworkers prior to Defendant's decision to terminate Plaintiff's employment.

11. For example, on or around August 22, 20217, Plaintiff became aware several people within his department at BEA were openly discussing his disabilities.

12. Plaintiff became aware of another instance of his coworkers discussing his disabilities nearly a year later on or about August 7, 2018. The same happened again the following year in September 2019.

13. Plaintiff's supervisors have also told him he needed to smile more and threatened the loss of research contracts if he did not interact with colleagues in more sociable ways. Senior managers instructed Plaintiff to appear more "excited and animated" when presenting proposals for BEA-approved research funding, and to avoid demonstrating a "flat affect," else he would not get the funding.

14. Since at least 2012, Plaintiff's coworkers, including senior management also gave him the moniker and repeatedly referred to him as *Bubbles*.

15. Aside from being referred to as *Bubbles* and various comments directed to Plaintiff about his ability to recall information and being perceived as socially awkward or impaired, at least one research group, including its leadership, openly discussed their perception of Plaintiff's disabilities as early as 2017.

16. The acting manager of Plaintiff's department was aware of Plaintiff' significant social impairments and the discussions of Plaintiff's coworkers about his autism as far back as 2017. Defendant refused to interview the acting department manager during its later investigation.

17. Nevertheless, Plaintiff excelled professionally and received raises for several years through 2019.

18. Prior to November 2019, Plaintiff had never received a negative review.

19. In 2017, Defendant assigned Plaintiff to mentor Ariana Foley, a graduate student from Oregon State University.

20. Plaintiff mentored Foley in 2018 and 2019.

21. On November 13, 2019, Foley filed a complaint with BEA against Plaintiff, making several allegations that were untrue and known to BEA management and HR to be untrue.

3- COMPLAINT AND DEMAND FOR JURY TRIAL

22. Plaintiff was supervising Foley at the time and refused to submit for publication a paper on which she was a co-author with Plaintiff and at least one other senior scientist because Foley's draft did not meet Plaintiff's professional standards. Foley was frustrated by Plaintiff's refusal to submit the paper, even though Plaintiff had taken several weeks of personal leave so that he could come into work and rewrite what Foley had drafted to get it ready for publication.

23. Following Plaintiff's termination, BEA advised Foley to remove Plaintiff's name as a co-author of the paper. She removed his name, made superficial changes to Plaintiff's draft, and submitted it for publication, claiming it as her own, even though Plaintiff came up with the idea for the project, created the math to make it work, conducted the bulk of the research, and did most of the drafting.

24. Plaintiff met with Employee Relations investigator Brandon Fowler and Program Manager Devon Jackson pursuant to their investigation of Foley's allegations and told both individuals he did not like that his coworkers discussed his disabilities.

25. The most egregious alleged misdeeds their interview turned up were that Plaintiff was highly critical of Edna Cardenas, a staff member he had mentored years prior, and that he generally admitted to controlling various aspects of her professional output, as would be expected of a mentor and principal investigator overseeing the project that was funding her work.

26. Plaintiff also told the interviewers he believed Cardenas encouraged Foley to bring the complaint against Plaintiff because Cardenas blamed Plaintiff for her current lack of work.

27. Jackson also interviewed Plaintiff's supervisor, Kevin Carney and his one-time manager Mike Miller. Carney described Plaintiff as, among other things, not socially graced; abrupt, short and abrasive at times; not malicious, but usually right about his concerns; someone who

is uncomfortable with conflict.

28. Carney also said he was aware of a "temper flare" before Thanksgiving that year, but chalked it up to nothing more than a rough day between Plaintiff and Foley.

29. Carney also expressed surprise by the investigation because he had never seen Plaintiff make advances or touch anybody.

30. Fowler and Jackson refused to interview at least three individuals, despite Plaintiff's request that they do so.

31. Following the investigation, Defendant convened a PAAG meeting on January 6, 2020.

32. The PAAG determined Plaintiff had engaged in a form of sexual harassment and created a hostile work environment for Foley.

33. Plaintiff's managers requested the PAAG be adjourned to so that a corrective action plan could be introduced. Some members of the PAAG did not want to follow the corrective action plan specifically because Plaintiff had been characterized as blunt and abrupt.

34. Miller, Kiestler, and Carney met with Plaintiff and told him that Defendant was going to offer a corrective action plan if Plaintiff would agree to it. However, they never told Plaintiff any of the specific allegations against him. They also said they were aware Plaintiff was blunt and abrupt when speaking with others and that they believed Plaintiff was largely unaware that others had that perception. Kiestler told Plaintiff that Defendant was "looking for fire, but couldn't find any" in their efforts to punish Plaintiff.

35. Plaintiff told the managers he suffered from social anxiety in response to the statement about him being blunt or abrupt, but was not allowed to explain further or discuss his other diagnosis. Plaintiff was told he was there to listen and that he should not try to ascertain what the accusations were as the best plan for his continued employment.

36. One of the managers then informed Plaintiff if he upset any of his coworkers further, his employment would be terminated. To that warning, Plaintiff immediately replied with a request for accommodations for his disabilities by stating he needed assistance in the form of recording devices in his office, the ability to work on his own, permission to communicate only by email so that a written record existed of all his communications, and permission to work from home.

37. BEA refused Plaintiff's requests for accommodation and refused to even discuss those or any other accommodations.

38. Plaintiff clearly told Miller, Kiestler, and Carney he would follow whatever guidance they gave him and adhere to the corrective action plan even though they never told him what he was accused of doing. Plaintiff also told them he was impaired and asked for accommodations. While Plaintiff said he would do whatever was asked of him to keep his job, because the PAAG did not believe Plaintiff demonstrated accountability for unknown accusations, Defendant proceeded with termination of Plaintiff's employment the following day.

39. Defendant's PAAG ignored the manifestations of Plaintiff's disabilities, particularly in stressful situations, which include social impairment, and an inability to outwardly exhibit emotions as a neurotypical individual would. Moreover, Defendant completely ignored the fact that Plaintiff explicitly told Miller, Kiestler, and Carney he was disabled and socially impaired.

40. Shortly after Defendant's decision to terminate Plaintiff's employment, the Associate Laboratory Director for BEA and member of the PAAG held an all-hands meeting with the Nuclear Nonproliferation Division and stated that had Plaintiff smiled more, things might

have turned out differently for him.

41. Plaintiff dually filed a charge of discrimination with the Idaho Human Rights Commission and the EEOC within 300 days of any adverse employment action and received a Notice of Right to Sue letter dated August 26, 2021.

42. Plaintiff has exhausted his administrative remedies.

## COUNT I
## VIOLATION OF THE ADA/IHRA
### (Disability Discrimination)

43. Plaintiff realleges and incorporates by reference paragraphs 1 through 42 above, as though fully set forth herein.

44. Plaintiff has or had at all times relevant to this lawsuit, one or more disabilities, a record of one or more disabilities, and/or Defendant perceived Plaintiff as being disabled, as defined by the ADA and the IHRA.

45. Plaintiff was qualified for his job and was performing the essential functions of the job satisfactorily, with or without accommodation.

46. Plaintiff has actual or a record of disabilities that substantially limit one or more major life activities, including his ability to interact with others, communicate, or outwardly express emotion.

47. Defendant took adverse employment action against Plaintiff based upon his disabilities by conducting a baseless investigation, holding a PAAG, and terminating Plaintiff's employment because of his disabilities.

48. As a direct and proximate result of Defendant's actions and/or failure to act, Plaintiff was hospitalized. Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation based upon the discrimination he experienced. Further,

Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

49. Defendant's conduct was malicious and done with reckless indifference to Plaintiff's federally protected rights. Consequently, Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. § 1981a.

## COUNT II
## VIOLATION OF THE ADA/IHRA
### (Failure to Accommodate)

50. Plaintiff realleges and incorporates by reference paragraphs 1 through 49 above, as though fully set forth herein.

51. Plaintiff requested reasonable accommodations from Defendant based upon his disability, which Defendant refused.

52. Plaintiff requested from Miller, Kiestler, and Carney recording devices in his office, the ability to work on his own, permission to communicate only by email so that a written record existed of all his communications, and permission to work from home to enable him to continue to work despite his disabilities. Defendant refused any and all requests for accommodation.

53. As a direct and proximate result of Defendant's actions and/or failure to act, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff has also suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation because Defendant failed to accommodate his disabilities. Plaintiff is thereby entitled to general and compensatory damages in an amount

to be proven at trial as well as any other equitable remedies available to him.

54. Defendants' conduct was malicious and oppressive, and done with reckless disregard for Plaintiff's federally protected rights, for which he is entitled to punitive damages.

### COUNT III
### VIOLATION OF THE ADA/IHRA
**(Retaliation)**

55. Plaintiff realleges and incorporates by reference paragraphs 1 through 54 above, as though fully set forth herein.

56. Plaintiff engaged in a protected activity under the ADA and the IHRA, including but not limited to participating in Defendant's investigation and requesting accommodations for his disabilities.

57. Defendant subjected Plaintiff to adverse post-employment retaliation as a result of his protected activity by refusing to contract with any company for which Plaintiff might be employed. Specifically, Plaintiff was in the process of being hired by Blackmere Consulting, but was not hired after Defendant refused subcontracts with Blackmere so as to exclude Plaintiff.

58. Defendant further retaliated against Plaintiff by advising Foley to submit for publication Plaintiff's research and work product under her name, thereby claiming and passing off Plaintiff's work as her own and depriving Plaintiff of credit for his own ideas and research.

59. As a direct and proximate result of Defendant's retaliatory actions, Plaintiff has suffered, and will continue to suffer, economic harm, emotional distress, consisting of outrage, shock, and humiliation, reasonably occurring and likely to occur based on the retaliation he experienced. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

60. Defendant's conduct was willful or done with a reckless disregard for Plaintiff's federally protected rights, for which Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. § 1981a(a).

## COUNT IV
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

61. Plaintiff realleges and incorporates by reference paragraphs 1 through 60 above, as though fully set forth herein.

62. Defendant owed Plaintiff a legal duty to not take adverse employment actions and adverse post-employment actions against him because of his disabilities.

63. Defendant breached that duty by terminating Plaintiff's employment without considering his known disabilities and refusing to contract with companies that employed Plaintiff.

64. Plaintiff suffered a panic/anxiety attack the afternoon and into the evening of the second day of the PAAG. The stress and anxiety of the PAAG caused him to not eat or drink which also caused hyperglycemia and renal injury, all of which required hospitalization and prescription medication for treatment.

65. Plaintiff suffered both economic and emotional harm as a direct and proximate result of Defendant's conduct inasmuch as Defendant has suffered lost wages, medical expenses, and was hospitalized due to the distress the situation caused, which caused Plaintiff actual loss or damage. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

66. Plaintiff realleges and incorporates by reference paragraphs 1 through 65 above, as though fully set forth herein.

67. Alternatively, Plaintiff suffered intentional infliction of emotional distress on account of Defendant's intentional or reckless conduct in failing to conduct a proper investigation of the charges against Plaintiff, terminating Plaintiff's employment for unsubstantiated reasons, and refusing to contract with companies that employed Plaintiff, which conduct was extreme and outrageous.

68. There was a causal connection between Defendant's wrongful conduct and Plaintiff's severe emotional distress as evidenced by Plaintiff's hospitalization the second day of the PAAG to treat symptoms of anxiety brought on by Defendant's investigation and termination of Plaintiff's employment as well as Defendant's refusal to contract with any company that employed Plaintiff.

69. Plaintiff suffered both economic and emotional harm as a direct and proximate result of Defendant's conduct inasmuch as Defendant has suffered lost wages, medical expenses, and was hospitalized due to the distress the situation caused, which caused Plaintiff actual loss or damage. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT VI
## BREACH OF FIDUCIARY DUTY
### (Violation of Moral Right/Right of Paternity/Attribution)

70. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above, as though fully set forth herein.

71. Following Defendant's termination of Plaintiff's employment, Defendant advised Foley to remove Plaintiff's name from a scientific paper to which he made significant contributions in terms of both research and authorship.

72. Thereafter, Foley submitted the paper for publication under her name with no attribution to

       Plaintiff as a co-author of the paper despite the fact that the paper dealt with Plaintiff's research and includes much of his writing.

73.    The publication of the paper without Plaintiff's name deprived him of the opportunity to complete drafting the paper and the professional notoriety and credit associated with publishing scientific papers in professional journals.

74.    As a direct and proximate result of Defendant's breach, Plaintiff has suffered, and will continue to suffer, economic harm, emotional distress, for which he is entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## ATTORNEY'S FEES

As a further direct and proximate result of Defendant's actions and/or failure to act, Plaintiff has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs and attorney's fees which Defendant should be required to pay pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and 42 U.S. C. § 12205.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

1. For compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial and any available equitable remedies;
2. For punitive damages;
3. For pre-judgment interest;
4. For attorney's fees pursuant to statute and costs of suit; and

12- COMPLAINT AND DEMAND FOR JURY TRIAL

5.   For such other and further relief as the Court deems just and proper.

Dated this 19th day of November, 2021.

                                              /s/ _____
                                              Ryan S. Dustin, Esq.
                                              CASPERSON ULRICH DUSTIN PLLC